IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **JEFFREY WONSER,**<br><br>　　　　　　　*Plaintiff,*<br><br>　　v.<br><br>**CHARLES L. NORMAN,** *et al.,*<br><br>　　　　　　　*Defendants.* | Case No.: 2:24-cv-02160<br><br>Judge Sarah D. Morrison<br><br>Magistrate Judge Elizabeth A. Preston Deavers |
| **JEFFREY WONSER'S MOTION FOR A PRELIMINARY INJUNCTION** | |

　　　　Plaintiff Jeffrey Wonser respectfully moves for a preliminary injunction barring

Defendants from enforcing their rules for vanity license plates and requiring them to approve Mr.

Wonser's application for a license plate reading "F46 LGB." As laid out below, those rules are

void for vagueness and unconstitutionally overbroad.

## TABLE OF CONTENTS

Summary of Argument ..................................................................................................3

Issues Presented .........................................................................................................5

Facts ...........................................................................................................................5

Legal Standard ...........................................................................................................8

Law & Argument ........................................................................................................8

    I.    Because Defendants' censorship regime violates the First Amendment, Mr. Wonser is likely to prevail on the merits. ...........................................................................8

        A.    Defendants' censorship regime violates the First Amendment because it is unconstitutionally vague. ....................................................................8

        B.    Defendants' censorship regime violates the First Amendment because it is unconstitutionally overbroad. ...........................................................13

        C.    Defendants' censorship regime violates the First Amendment because it fails even the most forgiving analysis for mere "reasonableness." .............................19

            1.    Defendants' censorship regime is not reasonable because its parameters cannot be objectively applied to achieve reasonable ends. ...........................20

            2.    Defendants' censorship regime is not viewpoint-neutral because it discriminates between promoting and disparaging certain topics. .................24

    II.    Because the remaining preliminary-injunction factors are *per se* satisfied when a plaintiff is likely to succeed on a First Amendment claim, the Court should grant Mr. Wonser injunctive relief. ...........................................................................27

Conclusion ...............................................................................................................28

Certificate of Service ...............................................................................................29

## SUMMARY OF ARGUMENT

Courts across the Sixth Circuit agree the First Amendment protects vanity license plates:

- Michigan's ban on vanity license plates "offensive to good taste and decency" was struck down in 2014. *Matwyuk v. Johnson*, 22 F. Supp. 3d 812, 824 (W.D. Mich. 2014) ("[T]he First Amendment applies to messages on personalized license plates.").

- Kentucky's ban on vanity plates promoting "any specific faith, religion, or anti-religion" was struck down in 2019. *Hart v. Thomas*, 422 F. Supp. 3d 1227, 1233 (E.D. Ky. 2019) ("[V]anity plates are private speech protected by the First Amendment.")

- And just last year, the Tennessee court of appeals reversed a trial-court decision that vanity plates are government speech. *Gilliam v. Gerregano*, 2023 WL 3749982, at *15 (Tenn. Ct. App. June 1, 2023) (ordering trial court "to re-evaluate Plaintiff's claims in an entirely different framework, to-wit, the strictures of the First Amendment").[1]

Now it's Ohio's turn. After launching its vanity-plate program 50 years ago, the Bureau of Motor Vehicles began censoring applications based on whether the registrar found them "controversial … offensive, disparaging or socially insensitive."[2] In 2001, the Bureau settled a First Amendment lawsuit by agreeing to work with less amorphous classifications—such as "profanity," "sexually explicit," or "advocacy of imminent lawless activity"—but two decades later, they are backsliding. While the criteria they adopted in 2001 are of dubious constitutionality themselves, Defendants admit that they are not actually using them; instead, they now permit their censors to reject messages merely because they think someone else may "perceive" them as falling into one of their forbidden categories.

---

[1] *See also*, *Overington v. Fisher*, 2024 WL 2153403, at *3 (D. Del. May 14, 2024) ("[T]he alphanumeric sequence on vanity plates does not constitute government speech."); *Ogilvie v. Gordon*, 540 F. Supp. 3d 920, 933 (N.D. Cal. 2020) ("[A] ban of personalized license plate configurations 'offensive to good taste and decency' violates the First Amendment."); *Carroll v. Craddock*, 494 F. Supp. 3d 158, 168 (D.R.I. 2020) ("Prohibiting FKGAS because it carries a connotation that might be offensive is sufficiently likely to run afoul of *Brunetti* as to easily satisfy the 'likelihood of success on the merits' prong.").

[2] Complaint, ¶ 26.

This was just what happened to Mr. Wonser. He sought to place an ambiguous message on his license plate, but Defendants refuse to allow it. Though his message objectively does not contain any word or phrase that is profane, Defendants rejected it because they concluded that others may interpret it as having a profane meaning.

But the government must clear high hurdles to impose limits like this on free speech:

- Speech restrictions must not be vague. A law may be unconstitutionally vague because ordinary people cannot understand what it prohibits, or because its standards are so loose as to authorize or encourage arbitrary and discriminatory enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). As laid out on page 8, Defendants' censorship regime fails on both accounts, as different employees enforce different sets of rules, leading to inconsistent results and encouraging discriminatory enforcement.

- Speech restrictions must not be overbroad. A law may be overbroad if the potential for its unconstitutional applications is substantial in comparison to its plainly legitimate applications. *Morales* at 52. As laid out on page 13, Defendants' censorship regime is overbroad because it permits state officials to invent a justification for prohibiting literally any message they dislike.

- Speech restrictions must be reasonable. Reasonableness is not to be assessed "in the abstract," but instead by asking whether, given the forum's purpose, the state is using "reasonable means" to "pursue reasonable ends." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transportation*, 978 F.3d 481, 494 (6th Cir. 2020). As laid out on page 20, Defendants' censorship regime is not reasonable because it undermines, rather than advances, the purpose of the vanity-plate program, which was created to generate revenue for roadside parks.

- Speech restrictions must be enforced without respect to the speaker's viewpoint. "The government may reserve nonpublic forums for speech on certain subjects while banning speech on other subjects. ... But the government may not go further by prohibiting specific viewpoints on the topics that it allows." *Am. Freedom Def. Initiative* at 498. As laid out on page 24, Defendants' censorship regime is not viewpoint neutral, as Defendants permit some races, ethnicities, sexual orientations, gender identities, and religions to use vanity plates to identify themselves while forbidding others from doing the same.

As laid out below, Defendants run afoul of virtually every First Amendment rule they encounter, so the Court should hold that their censorship regime is unconstitutional, and enter a preliminary injunction barring them from enforcing it and requiring them to approve Mr. Wonser's application.

### ISSUES PRESENTED

1. A rule is unconstitutionally vague if ordinary people cannot understand what it prohibits or if its rules are so flexible as to permit arbitrary or discriminatory enforcement. Defendants evaluate vanity license plates based on individual censors' subjectively assessments of how unidentified third parties will perceive the plate. Does a rule relying on bureaucrats' guesses about third parties' perceptions allow ordinary people to understand what speech is permitted and what speech is prohibited?

2. A rule is unconstitutionally overbroad if its potentially impermissible applications are substantial in relation to its plainly permissible applications. Defendants reject messages on vanity license plates if they "can be perceived" as a profane or sexual or scatological word (or phrase, or abbreviation of a phrase), in any language, when read forward or backward. Are the potentially impermissible applications of such a rule substantial in comparison to its plainly permissible applications?

3. In a nonpublic forum, speech restrictions must be reasonable means of achieving reasonable ends, given the forum's purpose. Defendants created the vanity-plate forum to generate revenue to fund roadside parks, but they reject application fees from people with messages they perceive as profane. Is refusing money from people with profane messages a reasonable way to generate revenue for roadside parks?

4. In a nonpublic forum, speech restrictions may not discriminate on the basis of a speaker's viewpoint. Defendants allow drivers to use vanity plates to communicate that they are "MEXICAN," "HETERO," or "BAPTIST," but not as "RUSSIAN," "GAY," or "MUSLIM." May Defendants create different rules for different nationalities, sexual orientations, and religions?

### FACTS

Mr. Wonser is the owner of a 2016 Toyota Sienna. On March 10, 2022, he applied for a vanity license plate through the Ohio Bureau of Motor Vehicles website. He asked for a license plate reading "F46 LGB," a combination of letters and numbers that has no clear meaning. Some people view the 4 and 6 as stand-ins for the letters A and G, rendering the message as "FAG

LGB," an attempt to reclaim a derogatory slur for lesbians, gays and bisexuals. Others read it as code for "Fuck 46, Let's Go Brandon," a harshly phrased condemnation of the Biden Administration.

Mr. Wonser has embraced that ambiguity. When the BMV asked him which message his license plate meant, he offered a third interpretation, telling them that it referred to a solitaire game. But the BMV's censors reached their own conclusions, deciding that his message was, in fact, a coded condemnation of the Biden Administration. They denied his application "due to the potential perception of inappropriateness"[3] but invited him to appeal.[4]

Mr. Wonser's appeal leaned further into the ambiguity, adopting yet another meaning for his message: He informed the state's censors that "F46" is actually a designation for athletes in the Paralympics; "LGB," he told them, was meant to cheer on Brandon Lyons, a member of the Paralympic Cycling National Team who was training for the 2023 Para Pan-American Games.[5]

Mr. Wonser's refusal to be pinned down on the meaning of his message is deliberate. He relishes the ambiguity of his message and revels in others' reactions to it, permitting them to experience the visceral responses associated with encountering a message from one end of the political spectrum only to face the possibility that it may actually come from a polar-opposite perspective. His message is admittedly not the prototypical example, but Mr. Wonser's technique nonetheless connects him to countless authors whose works likewise challenge audiences to reach their own conclusions about authorial intent:

> A work of art, therefore, is a complete and *closed* form in its uniqueness as a balanced organic whole, while at the same time constituting an *open* product on

---

[3] Defense Ex. 1-A, p. 3 (ECF #4-1).
[4] Defense Ex. 1-A, p. 2 (ECF #4-1).
[5] He qualified and locked in Team USA's sweep of all the medals in his event.

account of its susceptibility to countless different interpretations which do not impinge on its unadulterable specificity.[6]

The BMV, however, doesn't cotton to such postmodernist balderdash. Taking a page from the Russian formalists, it purported to divine a single, fixed meaning to Mr. Wonser's message—"Fuck Joe Biden"—and then used that meaning to reject his appeal, explaining that it did not want to disseminate "messages or causes which may be distasteful or offensive"; purporting to derive authority to decide which messages "will or will not be displayed" from Ohio Rev. Code § 4503.19, it again concluded Mr. Wonser's message was unacceptable "due to the potential perception of inappropriateness,"[7] though Defendant Norman followed up again the next week, saying Mr. Wonser's message fell into a "prohibited category," but not which one.[8]

Mr. Wonser hired counsel to appeal that decision to Defendant Norman's supervisor, Defendant Stickrath.[9] Defendants rejected the appeal, noting that "Mr. Wonser has provided varying explanations for the meaning of his requested personalization."[10]

After Defendant Wilson replaced Defendant Stickrath as director of the Ohio Department of Public Safety, Mr. Wonser sought to persuade him to respect First Amendment and issue his license plate.[11] But the Department refused to allow him to even fill out the application, programming their computers to reject his message so they would never have to deal with it again.[12]

---

[6] Umberto Eco, *The Role of the Reader: Explorations in the Semiotics of Texts* (Bloomington: Indiana University Press, 1979), 49.

[7] Defense Ex. 1-B (ECF #4-1).

[8] Defense Ex. 1-C (ECF #4-1).

[9] ECF #12-39, WONSER_003715.

[10] ECF #12-41, WONSER_003719.

[11] ECF #12-47, WONSER_003720.

[12] Declaration of Jeffrey Wonser, ¶ 8–9 (ECF #12-51).

Mr. Wonser therefore brought this action, alleging that Defendants' censorship regime is void for vagueness, overbroad, and unconstitutional as applied to his message.

### LEGAL STANDARD

In most cases, a court considering a preliminary injunction must consider and balance "(1) the plaintiff's likelihood of success on the merits, (2) whether the plaintiffs could suffer irreparable harm without the injunction, (3) whether granting the injunction will cause substantial harm to others, and (4) the impact of the injunction on the public interest." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996).

### LAW & ARGUMENT

**I.   Because Defendants' censorship regime violates the First Amendment, Mr. Wonser is likely to prevail on the merits.**

**A.   Defendants' censorship regime violates the First Amendment because it is unconstitutionally vague.**

Vagueness may invalidate a law for either of two independent reasons: "First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Morales* at 56.

For instance, in *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 360 (6th Cir. 1998), a union challenged a transit agency's rule against "controversial" advertisements on its buses. The district court held that the rule was not void for vagueness; because it was designed to protect agency revenue by rejecting ads that might discourage ridership and thus reduce revenue, it clearly identified what messages it prohibited by measuring their potential effect on the agency's commercial interests. But the Sixth Circuit rejected that analysis, holding that the rule was unconstitutionally vague because it

permitted the agency to reject ads simply because they "may" affect ridership rather than requiring "demonstrated causality" before rejecting a message:

> In the absence of requiring a demonstrable causality between an advertisement's controversial nature and SORTA's interests, the Policy invites "subjective or discriminatory enforcement" by permitting the decisionmaker to speculate as to the potential impact of the controversial advertisement on SORTA's interests.

And because the agency also had a rule requiring ads to be "aesthetically pleasing," its policies also failed the other prong of the vagueness analysis, as such a subjective rule "invites arbitrary or discriminatory enforcement":

> Since it is not susceptible to objective definition, the "aesthetically pleasing" requirement grants SORTA officials the power to deny a proposed ad that offends the officials' subjective beliefs and values under the guise that the ad is aesthetically displeasing."

Here, Defendants' censorship regime likewise fails both tests. First and foremost, a person of ordinary intelligence has no way of knowing what their rules permit and prohibit, because Defendants themselves don't even know what rules they're supposed to be applying.

**Rule 1:** At one point, they purport to derive authority "to determine which combinations will or will not be displayed" from Ohio Rev. Code § 4503.19.[13]

**Rule 2:** When the BMV first rejected Mr. Wonser's message, though, it told him it was enforcing a rule against license plates with a "potential perception of inappropriateness."[14]

**Rule 3:** But Defendant Norman claimed to be applying still other rules when he issued his final decision rejecting Mr. Wonser's message, saying:

> The BMV does not issue any special license plate that contains words, combinations, and/or phrases (in any language, whether frontwards or backwards)

---

[13] Defense Ex. 1-B (ECF #4-1).
[14] Defense Ex. 1-A, p. 3 (ECF #4-1).

that … Are profane or *can be interpreted* as obscene, sexually explicit, or scatological (i.e., pertaining to feces or excrement).[15]

Given Defendants' own indecision, a person of ordinary intelligence cannot reasonably determine what is permitted and what is prohibited, as the rules change depending on who is enforcing or interpreting them. In turn, that invites arbitrary and discriminatory enforcement, as a censor may choose to apply more or less restrictive rules, depending on whether they approve of a message.

Even if Defendants could make up their minds, each rule would fail under both tests, as each one fails to give people of ordinary intelligence any way of knowing what it permits and what it prohibits, and likewise confers sufficient discretion on the government to encourage arbitrary and discriminatory enforcement.

Rule 1 allows the registrar to decide which messages to approve and deny based on Ohio Rev. Code § 4503.19. But that law that imposes literally no limits whatsoever on which messages to approve and deny, and it therefore confers unbridled discretion on the registrar to impose arbitrary and discriminatory limits.

Rule 2 fails because it is not based on a message's actual meaning or any demonstrated effect it might have, but rather on how unrelated third parties might react to it, asking not what the message says but whether it is subject to a "potential perception of inappropriateness." What that even means is anyone's guess. Inappropriate by what standard? As perceived by whom? And how much potential is too much? No one knows, other than the censors themselves as they make *ad hoc* determinations from one application to the next.

---

[15] Defense Ex. 1-C (ECF #4-1). (emphasis added).

Even Rule 3, the most detailed set of rules Defendants have purported to apply, is too vague to pass muster. People of ordinary intelligence do not have sufficient linguistic capacities to determine not only whether their message is profane, obscene, sexually explicit, or scatological in English, but also whether it meets any of those criteria when read backwards in Arabic, Bengali, Chinese, Dothraki, Esperanto, Fijian, Gaelic, Hindi, Icelandic, Javanese, Klingon, Latin, Malay, Norwegian, Oromo, Portuguese, Quenya, Russian, Swahili, Turkish, Uzbek, Vietnamese, Welsh, Xavante, Yoruba, and Zulu.

Even with a universal translator to assist with that task, an ordinary person still couldn't decipher what is prohibited and what is not, because they would still have no way of knowing whether those translations "can be interpreted" as "obscene" or "sexually explicit." Such an amorphous standard raises all the same question as the "potential perception of inappropriateness" standard, especially when, as Joey Tribbiani taught us nearly thirty years ago, literally any word or phrase can be given a sexual interpretation.[16]

Defendants' admissions make clear that their rules do not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A person of ordinary intelligence cannot look at the combination "F46 LGB" and know whether it is permitted or prohibited, nor can they decipher how Defendants will handle countless other combinations:

- A person of ordinary intelligence has no way of knowing that "F46" and "LGB" are permitted on separate plates, but not together on one license plate.[17]

---

[16] *Friends*, "The One Hundredth" (NBC television broadcast Oct. 8, 1998) https://youtu.be/ueKxlz2pSew&t=48s. *See also, The Late Show With Stephen Colbert*, "John Legend Makes Mundane Things Sound Sexy," (CBS television broadcast April 25, 2017) https://youtu.be/-YgaUzx9p-k?t=133.

[17] Complaint and Answer, ¶¶ 62.

- A person of ordinary intelligence has no way of knowing whether the BMV censor their application happens to land in front of will believe that someone could perceive "SL4YER" or "XKXX" or "GYLTY" or "HIT" or "LOLICON" or "PKLPMP" or "STUKATS" as inappropriate, profane, obscene, sexually explicit, or scatological.[18]

- A person of ordinary intelligence has no way of knowing that "AXEHOLE" is prohibited, but "AXE HOLE" is permitted.[19]

- A person of ordinary intelligence has no way of knowing that "REDRUM8" is prohibited, but "REDRUM6" is permitted.[20]

- A person of ordinary intelligence has no way of knowing that "DUMBAZZ" is prohibited, but "AZZ" is permitted.[21]

And Defendants admit that they are exercising this authority based on something other than a "demonstrated causality" between the message and the revenue-raising purposes of the vanity-license program. Like the transit agency rejecting messages that "merely 'may' affect SORTA's ridership," *UFCW, Loc. 1099* at 360, Defendants are rejecting messages based merely on how they believe their mysterious "someone" *might* perceive each message:

- When a driver requested a plate reading "BOSS BSH," Defendants admit they rejected it merely because their censor "believed someone could perceive "BSH" as a shortened form of 'bish,' which the censor believed someone could in turn perceive as slang for 'bitch.'"[22]

- When a driver requested a plate reading "BICHOTA," Defendants admit they rejected it merely because their censor "believed someone could perceive it as meaning 'bitch.'"[23]

- When a driver requested a plate reading "370455 V," Defendants admit they rejected it merely because their censor "believed that it could be perceived as 'asshole.'"[24]

---

[18] Complaint and Answer, ¶¶ 43, 53, 58, 69.

[19] Complaint and Answer, ¶¶ 65.

[20] Complaint and Answer, ¶¶ 66.

[21] ECF #12-2, WONSER_000015.

[22] Complaint and Answer, ¶ 39.

[23] Complaint and Answer, ¶ 51.

[24] Complaint and Answer, ¶ 52.

- When a driver requested a plate reading "EFORTY6" for his BMW E46, Defendants admit they rejected it merely because their censor "believed it could be perceived as meaning 'Fuck Joe Biden.'"[25]

- When a driver requested a plate reading "YAOIPLZ," Defendants admit they rejected it merely because their censor "believed someone could perceive it as referring to *yaoi*, a genre of Japanese literature featuring same-sex romantic relationships."[26]

But that disconnect is more problematic here. While the transit agency was at least rejecting advertisements and their accompanying revenue with a goal of preserving net revenue, Defendants are rejecting vanity plates—and the application fees that come with them—for messages that would have no negative effect on the roadside parks they fund.

This kind of topsy-turvy enforcement is exactly what the void-for-vagueness doctrine was meant to prohibit. No person of ordinary intelligence can explain why "REDRUM6" is allowed but "REDRUM8" is not,[27] or why "HINDU" is permitted but "MUSLIM" is not.[28] Defendants' censorship regime is therefore void for vagueness, and the Court should enter a preliminary injunction barring them from enforcing it.

### B. Defendants' censorship regime violates the First Amendment because it is unconstitutionally overbroad.

"[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Morales* at 52.

Overbreadth analysis moves in two steps: "The first step … is to construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008). The second step asks whether the

---

[25] Complaint and Answer, ¶ 54.
[26] Complaint and Answer, ¶ 63.
[27] Complaint and Answer, ¶¶ 66.
[28] Wonser Decl., ¶ 11f.

law prohibits "a substantial amount of protected expressive activity." *Williams* at 297, when compared to the law's "plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

The Sixth Circuit's decision in *UFCW, Loc. 1099* at 362 addressed the overbreadth issue, as well, holding that a ban on "controversial" ads was an overbroad solution to the transit agency's goal of attracting and maintaining ridership. Although messages could be "controversial" because of the objective characteristics of the form in which they were presented, the agency's regulations permitted it to reject ads that were controversial "simply because the listener disagrees with the speaker's message":

> A viewpoint challenging the beliefs of a significant segment of the public, however, frequently will generate discord. Thus, an ad's controversy often is inseparable from the viewpoint it conveys. … We therefore can conceive of numerous cases where under SORTA's advertising policy "it is the treatment of a subject, not the subject itself, that is disfavored."

On a facial challenge for overbreadth, then, a court's analysis should turn "not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the [law] preventing him from doing so." *Forsyth Cnty.,* 505 U.S. at 133 n. 10 (1992).

Even if Defendants had been even-handedly applying their rules, then, that would not save their censorship regime from an overbreadth challenge, where the question is instead whether anything prevents them from abusing their discretion. But here, they couldn't survive either analysis, as Defendants admit that they are, in fact, rejecting messages not because they objectively violate "Guideline 1," but because one of their censors subjectively believes that someone, somewhere might perceive the message as having a forbidden meaning.[29]

---

[29] *See*, *e.g.*, Complaint and Answer, ¶ 39, 51, 52, 54, 63.

That has naturally led to the problems that the overbreadth doctrine was meant to prevent. As laid out above, Defendants are construing their criteria to permit messages carrying certain viewpoints while prohibiting messages carrying opposing viewpoints. And they are also prohibiting all manner of perfectly protected speech based on arbitrary determinations that they are insufficiently unrelated to a topic they have designated as "inappropriate."

This is just the overbreadth that was fatal to Mr. Wonser's application. While Defendants have yet to say how they define "profane," there are some words that clearly satisfy virtually any definition. But Defendants stretch the criteria well beyond those words to include "acronyms and abbreviations" for profane words, and far more. For instance:

- They rejected a concededly profane license plate reading "FUCK HER."[30]
- But then they go a step further and reject messages that can reasonably be read to include abbreviations for "fuck," such as "FUSARAH," though it does not actually contain any profane words.[31]
- Then they go a step further and reject strings of characters that have no actual meaning but could reasonably be read to sound profane, such as "PHUQQUE" and "OPHUX."[32]
- Then they go a step further and reject strings of characters that have no actual meaning and *cannot* reasonably be read as profane, such as:
  - "DRIVE TF," which they interpreted as "drive the fuck."[33]
  - "FURB," which they interpreted as "fuck you right back."[34]
  - "TNSAF," which they interpreted as "True North Strong As Fuck."[35]
  - "PSYSHIB," which they interpreted as "pussy fucking."[36]

---

[30] ECF #12-45, WONSER_001782.

[31] ECF #12-6, WONSER_000054.

[32] ECF #12-29, WONSER_000670.

[33] ECF #12-8, WONSER_000082–83.

[34] ECF #12-13, WONSER_000139–44.

[35] ECF #12-9, WONSER_000310.

[36] ECF #12-22, WONSER_000237.

o "EFORTY6," which they interpreted as "Fuck 46."[37]

Defendants' prohibition on "sexually explicit" messages provides another striking

example of the mission creep that naturally results when censors enjoy such broad authority:

- Defendants sometimes apply the rule to messages that are actually "sexually explicit," such as "ANAL SEX."[38]

- But they go a step further and apply the rule to words that are at best sexually euphemistic rather than explicit, such as "SHAG SW," which they rejected because it could mean "shag wagon."[39]

- Then they go a step further and apply the rule to strings of characters that can plausibly be read as referring to body parts that are critical to sexual function but are most frequently used for nonsexual purposes, such as "CML TOE"[40] and "T1NYPP."[41]

- Then they go a step further and apply the rule to strings of characters that can plausibly be read as referring to body parts that are *not* critical to sexual function but many people find erotic, such as "BEWB"[42] and "TITPINK."[43]

- Then they go a step further and apply the rule to strings of characters that can plausibly be read as acknowledging the mere state of nudity, such as "NOODS."[44]

- Then they go a step further and apply the rule to references to romantic literary genres that may or may not have any sex at all, rejecting "YAOIPLZ."[45]

- Then they go a step further and apply the rule to words that are obvious references to nonsexual subjects and assign them implausible sexual interpretations. For instance, when a driver asked to promote "prostate awareness" with an "End of Prostate Cancer" license plate reading "GETPKD," a BMV censor rejected it as sexually explicit.[46]

---

[37] ECF #12-37, WONSER_001298.

[38] ECF #12-5, WONSER_000466.

[39] ECF #12-16, WONSER_000175.

[40] ECF #12-36, WONSER_001490.

[41] ECF #12-40, WONSER_001605.

[42] ECF #12-31, WONSER_000898.

[43] ECF #12-20, WONSER_000415.

[44] ECF #12-14, WONSER_000353.

[45] ECF #12-1, WONSER_000453.

[46] ECF #12-17, WONSER_000380.

Likewise, where the criteria prohibit words that "advocate lawless activites," BMV censors regularly go far beyond that threshold:

- They rejected messages that merely refer to lawless activities without any advocacy, such as "STALKIN"[47] and "KILLERZ."[48]

- They rejected "PLZ B 18" as advocating immediate lawlessness because they interpreted it as "[a]sking if person is old enough to have relations," which would actually be an attempt to *avoid* lawless activity.[49]

- They rejected "SAKUJO," which they translated from Japanese as meaning "delete," because they found a fictional character who said the word "when killing folks."[50]

- The rejected "RX DEALR" from a pharmacist, even though it is legal for pharmacists to dispense prescriptions.[51]

Even when Defendants actually define the terms they use in their criteria, they still can't help themselves from using them to reject what is not prohibited. For instance, where the criteria prohibit words that are "scatological," which Defendants define as "having to do with fecal excrement,"[52] they will likewise reject references to non-fecal excrement, such as "IPALOT," "ICUP," and "IGOTZ2P."[53]

The overbreadth of Defendants' authority to censor messages is worse than it looks, because they will also abdicate their discretion to the motoring public, allowing any peeved driver to effect a heckler's veto on messages that Defendants have already concluded are perfectly permissible. For instance:

---

[47] ECF #12-12, WONSER_000120.
[48] ECF #12-18, WONSER_000386.
[49] ECF #12-44, WONSER_001770.
[50] ECF #12-26, WONSER_000772.
[51] ECF #12-42, WONSER_001802.
[52] Defense Ex. C.
[53] ECF #12-7, WONSER_000284.

- Defendants admit that they approved "LOLICON" but then recalled it because of "public complaints."[54]
- Defendants admit that they approved "LTLCKR" but then recalled it because of "public complaints."[55]

In the end, Defendants' criteria permit them—or any member of the public—to reject virtually any message they choose. If they can reject "TNSAF" merely because it has at least one letter to which they can arbitrarily assign a forbidden meaning, they can reject literally any message at all, no matter how plainly protected it is by the First Amendment. If Mr. Wonser wants to announce that he's from "OHIO," Defendants can reject that message as advocating lawlessness because it *could* be perceived as meaning "obstruct honest investigating officers." If he wants to tell people he's "PROLIFE," Defendants can reject that message as profane because it *could* be perceived as meaning "Police really oughtta lose in fucking everything." If he wants to encourage fellow drivers to "VOTE," Defendants can reject that message as sexually explicit because it *could* be perceived as meaning "vagina on the erection."

Defendants may argue that that these possibilities are implausible or should be ignored because all those plates have actually been issued, but on an overbreadth analysis, those arguments are irrelevant. The question is not just whether Defendants *have* adopted overly broad interpretations of their authority to squelch speech, but rather whether there is anything stopping them from doing so. *Forsyth Cnty.,* 505 U.S. at 133 n. 10 (1992). Under the current censorship regime, the record makes plain that there is not.

By construing their criteria to forbid not only messages that are objectively profane or sexually explicit, but also messages that "can be interpreted" as "inappropriate," Defendants have granted themselves unlimited discretion to ban whatever messages they want. Because

---

[54] ECF #12-43, WONSER_001720.
[55] ECF #12-7, WONSER_000284.

those criteria prohibit a substantial amount of protected expression—far beyond whatever "plainly legitimate sweep" Defendants might identify—their censorship regime is unconstitutionally overbroad.

> **C.      Defendants' censorship regime violates the First Amendment because it fails even the most forgiving analysis for mere "reasonableness."**

Mr. Wonser maintains that the vanity-plate program is a designated public forum, but regardless of what kind of forum it is, Defendants must be able to establish that their speech restrictions, at a minimum, "are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)

For instance, in *Am. Freedom Def. Initiative*, a religious group encouraging Muslims to leave Islam challenged a regulation banning "political" advertisements and ads that "scorn or ridicule any person or group of persons" in Detroit's public-transit system. Despite the group's contention that the advertising program created a designated public forum, the district court granted summary judgment for the transit system, holding that it had instead opened a nonpublic forum subject to far less scrutiny. But the Sixth Circuit reversed, holding that the forum question was irrelevant because in either case, the transit system's rules needed to be "reasonable and viewpoint neutral" but were in fact neither reasonable (because they "cannot be objectively applied") nor viewpoint neutral (because the agency offered different benefits for "those that promote [a] group and those that disparage it.").

The same is true here.

### 1. Defendants' censorship regime is not reasonable because its parameters cannot be objectively applied to achieve reasonable ends.

In a nonpublic forum, content-based speech restrictions must be "reasonable," i.e., "the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 16 (2018).

In *AFDI*, the Sixth Circuit clarified that reasonableness is not to be assessed "in the abstract," but instead by considering the purpose of the forum and asking whether the state is using "reasonable means" to "pursue reasonable ends." In the end, the state must at least be able to articulate a "sensible basis for distinguishing what may come in from what must stay out." *Am. Freedom Def. Initiative* at 494.

There, the court held that even if the ban on "political" advertisements was adopted to achieve a reasonable goal, it was not a reasonable policy because transit officials couldn't articulate any "objective, workable standards" for determining which ads were "political." Defining the term broadly to include anything "dealing with the structure or affairs of government" would prohibit get-out-the-vote ads, which the agency allowed; defining it narrowly to refer only to things "characteristic of political parties or politicians" likewise yielded inconsistent results. And in the absence of any guidance on what definition to use, agency employees couldn't even agree among themselves what ads were and were not political.

The same problems are present here. Defendants admit that the point of the vanity license plate program is "to fund roadside parks."[56] Mr. Wonser concedes this is a reasonable end, but Defendants' heavy-handed censorship regime is not a reasonable means of promoting that

---

[56] Complaint and Answer, ¶ 13.

objective. Approving "F46 LGB" generates the same amount of revenue for roadside parks as approving any other message, but rejecting it generates *no* revenue for roadside parks.

Nor can there be any "reasoned application," *Mansky* at 23, of a rule prohibiting messages that could be "perceived" or "interpreted" as "inappropriate," as those words could be defined expansively or narrowly or anywhere in between. Appropriate for whom? Appropriate for what occasion? Appropriate using what criteria? Defendants never say; they just leave those questions to the discretion of each individual censor. Just as in *AFDI*, this naturally leads to inconsistent results.

- Defendants rejected "F46 LGB" because "F46" and "LGB" could each be perceived as meaning "Fuck Joe Biden," but they admit they have nonetheless approved a license plate that reads "F46" and a license plate that reads "LGB."[57]

- Defendants rejected "YAOIPLZ" as inappropriate because it referred to a genre of Japanese literature,[58] but they admit they approved "MRS YAOI."[59]

- Defendants rejected "AXEHOLE" as inappropriate, but they admit they approved "AXE HOLE."[60]

- Defendants rejected "REDRUM8" for referring to murder, but they admit that they approved "REDRUM6."[61]

- Defendants rejected "SKEET," but they admit that they approved "JIZZ," even though both refer to semen.[62]

- Defendants rejected "EATCHIT," but they admit that they approved "EAT CHI T."[63]

---

[57] Complaint and Answer, ¶ 62.

[58] ECF #12-1, WONSER_000453.

[59] ECF #12-3, WONSER_000024.

[60] Complaint and Answer, ¶ 65.

[61] Complaint and Answer, ¶ 66.

[62] Complaint and Answer, ¶ 67; ECF #12-28, WONSER_000819.

[63] Complaint and Answer, ¶ 68.

- Defendants rejected "XXX JEEP" because "XXX could be perceived as relating to or denoting pornography,"[64] but they approved "XXXTRA," despite flagging it as "Sexually Explicit."[65]

- Defendants approved "AMFYOYO" for one driver in 2006 and for another driver in 2010, but they rejected it for another driver in 2021.[66]

Even when BMV censors are allowed to use the strictest criteria available, and even when they are permitted to interpret those criteria as broadly as they want, messages that nonetheless survive review by every single BMV censor remain subject to a heckler's veto:

- Defendants approved "LOLICON" but then recalled it based on public complaints.[67]

- Defendants approved "LTLCKR" but then recalled it based on public complaints.[68]

- Defendants approved "IAMHBIC" but then recalled it because a driver believed the B stood for "beotch."[69]

- Defendants approved "IDFW GAS" but then recalled it because a driver believed the F stood for "fuck."[70]

But their heckler's-veto option is likewise inhospitable to any reasoned application, as there is no apparent rule on when a public complaint is sufficient to trigger a recall. The evidence demonstrates that Defendants have received numerous other complaints but refused to recall the allegedly "inappropriate" plates:

- Defendants received multiple complaints about "KNATZ1," which drivers believed was "derogatory toward Jewish people," but Defendants did not recall the plate.[71]

- Defendants received a complaint about "TXTNDRV" but did not recall the plate.[72]

---

[64] ECF #12-15, WONSER_000360.
[65] ECF #12-21, WONSER_000231.
[66] ECF #12-11, WONSER_000103.
[67] Complaint and Answer, ¶ 69.
[68] Complaint and Answer, ¶ 69.
[69] ECF #12-10, WONSER_000314.
[70] ECF #12-24, WONSER_000632.
[71] ECF #12-19, WONSER_000211.
[72] ECF #12-4, WONSER_000324.

- Defendants received a complaint about "JAN 6 DC" but did not recall the plate. [73]

- Defendants received a complaint that a driver perceived "THICCUM" as referring to "thick ejaculate," but did not recall the plate.[74]

- Defendants received a complaint that a driver perceived "GO KYS" as meaning "go kill yourself" but did not recall the plate,[75] although they admit they rejected "PLSKYS" because they perceived it as meaning "please kill yourself."[76]

- Defendants received a complaint that a driver perceived "DMNKDS" as meaning "damn kids" but did not recall the plate,[77] although they denied "DMNBOOG" because they perceived it as meaning "damn boog."[78]

- Defendants received a complaint that a driver perceived "LETZGOB" as meaning "fuck Joe Biden" but did not recall the plate,[79] although they rejected "NEDIBJF" based on the same perception.[80]

These cases show that Defendants are not using reasonable means to achieve reasonable ends, as they repeatedly take positions that are diametrically opposed to each other in cases that would have the same impact on their goal of generating revenue for roadside parks, often interpreting their rules to *undermine* that objective by rejecting revenue from drivers who want to disseminate messages that would have no deleterious impact on funding for roadside parks. Because it is not governed by any objective, workable standards that would advance their goal of funding roadside parks, Defendants' censorship regime is not a reasonable restriction on speech.

---

[73] ECF #12-32, WONSER_000917.

[74] ECF #12-27, WONSER_000969.

[75] ECF #12-23, WONSER_001035.

[76] Complaint and Answer, ¶ 36.

[77] ECF #12-33, WONSER_001119.

[78] ECF #12-35, WONSER_001474.

[79] ECF #12-38, WONSER_001376.

[80] ECF #12-25, WONSER_000747.

### 2. Defendants' censorship regime is not viewpoint-neutral because it discriminates between promoting and disparaging certain topics.

"The government may reserve nonpublic forums for speech on certain subjects while banning speech on other subjects. ... But the government may not go further by prohibiting specific viewpoints on the topics that it allows." *Am. Freedom Def. Initiative* at 498.

In *AFDI*, the Sixth Circuit recognized that the starting point for analyzing viewpoint discrimination comes from the Supreme Court's recent decision in *Matal v. Tam*, 582 U.S. 218, 243 (2017). There, an Asian rock singer sought trademark protection for "The Slants," the name of his band, but the Patent and Trademark Office refused to register his mark, telling him that he was being too disparaging to Asian-Americans. The Federal Circuit affirmed, holding that because the government was merely refusing to register a mark, rather than prohibiting the singer from using it, there were no First Amendment issues. But the Supreme Court reversed, holding that having opened up its program to the public, the government could not then lock people out just because they have something negative to say:

> To be sure, the clause evenhandedly prohibits disparagement of all groups. It applies equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue. It denies registration to any mark that is offensive to a substantial percentage of the members of any group. But in the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint.

Here, Mr. Wonser is likely to succeed on the merits because the record—including their own admissions—demonstrates that Defendants are prohibiting messages that communicate specific viewpoints, even on topics that they permit to be discussed on vanity plates. They admit,

for instance, that they rejected "JJBH8TN" because it opposed the head of the Democratic party, but permitted "IH8GOP," which they interpreted it as opposing the Republican Party.[81]

They admit that they will permit the message "BLK PWR 6" but will not allow "WHT PWR 6."[82] And Defendants' own records leave no doubt about Defendants' interpretations of those messages. The applicant requesting it admitted that "BLK PWR" meant "black power," which BMV censors deemed "offensive," but approved anyway.[83] But they rejected "WHT PWR" as "offensive," given that it could be "Perceived as White Power."[84] And even when the applicant brought the disparate treatment to Defendants' attention, they refused to recall "BLK PWR 6" and continued to prohibit "WHT PWR 6."[85]

Defendants' viewpoint discrimination is not limited to politics and race. They likewise discriminate with respect to all manner of personal characteristics:

- **Ancestry:**
  - They admit they will not permit the message "POLACK," because it is "a derogatory term for a person with a Polish ancestry."[86] But they will permit neutral references to Polish ancestry, such as "POLISH3," "POLSK4" and "TH POLE."[87]
  - They will likewise permit "MEXICAN," "ASIAN," or "AMERICN," but refuse to issue "BEANER," "SLANT I" or "GRINGO."[88]
- **Sexual orientation:**

---

[81] Complaint and Answer, ¶ 76.

[82] Complaint and Answer, ¶ 78.

[83] ECF #12-34, WONSER_001537–38.

[84] ECF #12-30, WONSER_000879.

[85] ECF #12-34, WONSER_001537.

[86] Complaint and Answer, ¶ 44.

[87] ECF #12-46, WONSER_002883, WONSER_003072.

[88] Wonser Decl., ¶ 12b–c.

- o Defendants refuse to issue "GAY" or "LESBIAN," but permit "IM STR8" and "STR8."[89]

- o Defendants refuse to issue "HOMO" but permit "HETERO" and "NOHOMO."[90]

- o Defendants likewise reject "WLW," a common acronym referring to "women loving women," though they have issued both "MLW" and "WLM."[91]

- **Gender identity:** Defendants refuse to issue "QUEER" but permit "CIS."[92]

- **Religion:** Defendants have no issue with license plates reading "ATHEIST," "TAOIST," "SIKH," "BAHAI," or "HINDU," but they refuse to issue license plates reading "JEW" or "MUSLIM."[93]

- **High school football:** Defendants rejected "TIGSUX" because it disparaged the Massillon High School Tigers, but they will permit drivers to say "GO TIGER."[94]

These are exactly the distinctions that the viewpoint-neutrality requirement is meant to

address. While citizens are debating an issue, the government may not constrain with by

imposing a regulatory scheme that "dampens the vigor and limits the variety of public debate."

*New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). That rule holds true, regardless of the

topic. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 831 (1995) ("If the

topic of debate is, for example, racism, then exclusion of several views on that problem is just as

offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both

a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet

another political, economic, or social viewpoint.").

Because it admittedly discriminates based on what position drivers wish to communicate

on various subjects, Defendants' censorship regime is not viewpoint neutral. And because it is

---

[89] Wonser Decl., ¶ 12d.

[90] Wonser Decl., ¶ 12d.

[91] Wonser Decl., ¶ 12e.

[92] Wonser Decl., ¶ 12f.

[93] Wonser Decl., ¶ 12g.

[94] Complaint and Answer, ¶ 45; ECF #12-46, WONSER_002468.

likewise not reasonable, it violates the First Amendment, regardless of whether the vanity-plate program is a nonpublic forum or a designated public forum.

## II. Because the remaining preliminary-injunction factors are *per se* satisfied when a plaintiff is likely to succeed on a First Amendment claim, the Court should grant Mr. Wonser injunctive relief.

Although courts typically must evaluate and balance the four familiar factors before granting an injunction, the analysis is far simpler in First Amendment cases such as this one. Given the unique dangers posed by government restrictions on speech and the law's heavy presumptions against them, the four preliminary-injunction factors "collapse" into the question of success on the merits, asking "whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Cty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002).

For instance, in *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012), a pair of evangelists sought an injunction against regulations prohibiting "soliciting of causes" during the Fairborn Sweet Corn Festival. The district court refused to grant the injunction, holding that the rule was a reasonable restriction on the time, place, and manner of speech. But the Sixth Circuit reversed, holding that even if that were true, the plaintiffs were likely to succeed on the merits because the City's restrictions were not narrowly tailored to its interest in promoting smooth pedestrian traffic. And because the plaintiffs prevailed on the First Amendment question, the Sixth Circuit held they must prevail, as a matter of law, on all the other preliminary-injunction questions, as well:

> As explained above, the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the solicitation policy. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. Moreover, if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to

others can be said to inhere its enjoinment. Finally, it is always in the public interest to prevent violation of a party's constitutional rights.

As laid out above, the record demonstrates that Mr. Wonser is likely to succeed on the merits, as Defendants' censorship regime runs afoul of the First Amendment, no matter how you run the analysis. He therefore satisfies all the other requirements for injunctive relief under *Cty. Sec. Agency*. The facts specific to this case vindicate that "collapsed" approach:

- Granting the injunction will prevent irreparable harm because Mr. Wonser is irreparably injured every day that he is not able to disseminate his message to others who might see it on the road, in parking lots, or in front of his house. *Thompson v. DeWine*, No. 2:20-CV-2129, 2020 WL 2614447, at *3 (S.D. Ohio May 22, 2020) ("This Court found Plaintiffs were likely to succeed on the merits of their First Amendment claims, and every day that passes … is another day they are harmed."). And if Defendants are right that his message is best understood as opposition to the Biden Administration, the window of time in which that message carries significant import is rapidly closing.

- Granting the injunction will not cause substantial harm to others, as being exposed to free speech—even if that speech is "profane"—is not a cognizable injury unless "substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen v. California*, 403 U.S. 15, 21 (1971).

- Granting the injunction is in the public interest, as "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).[95]

## CONCLUSION

Defendants have empowered their censors with unjustifiably vague and overly broad authority to silence messages based on guesses of the public's subjective perceptions of those message. Given such a free hand, those censors are naturally silencing messages based not on whether doing so will reasonably advance their objective of funding roadside parks, but rather on

---

[95] This is particularly true in cases involving infringements on the right of free speech. *Nixon v. N. Local Sch. Dist. Bd. of Educ.*, 383 F. Supp. 2d 965, 975 (S.D. Ohio 2005) ("[P]rotection of constitutional rights, and particularly First Amendment rights, is always in the public interest.").

whether those messages align with the censors' preferred viewpoints. Doing so has injured Mr. Wonser by limiting his ability to disseminate counterspeech in opposition to the speech Defendants have approved. Because he continues to suffer an injury every day that Defendants perpetuate this scheme, the Court should hold that their censorship regime violates the First Amendment, enter a preliminary injunction barring them from enforcing those rules, and require them to approve Mr. Wonser's application.

Respectfully submitted,

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
Speech Law, LLC
4403 Saint Clair Ave, Suite 400
Cleveland, OH 44103-1125
216-912-2195 Phone/Fax
brian.bardwell@speech.law
*Attorney for Plaintiff Jeffrey Wonser*

### CERTIFICATE OF SERVICE

I certify that on October 7, 2024, this document was served on opposing counsel as provided by Fed. R. Civ. P. 5(b)(1).

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
*Attorney for Plaintiff Jeffrey Wonser*